# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **MARCUS PEARSON,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **NO. 3:16-cv-03018** |
| | ) | **CHIEF JUDGE CRENSHAW** |
| **BRUCE WESTBROOKS, Warden,** | ) | |
| | ) | |
| **Respondent.** | ) | |

## MEMORANDUM OPINION

Marcus Pearson, a state inmate, filed a *pro se* petition for the writ of habeas corpus under 28 U.S.C. § 2254 ("Petition"). (Doc. Nos. 1 and 11.) Respondent filed an Answer (Doc. No. 29), and Petitioner filed a Reply (Doc. No. 30). Petitioner also filed two letters (Doc. Nos. 31 and 32) and a Motion for Bond (Doc. No. 34). For the following reasons, the Petition will be denied, the Motion for Bond will be denied as moot, and this action will be dismissed.

## I.     Background and Procedural History

On September 28, 2006, a Davidson County grand jury indicted Petitioner and Elvin Pearson, Petitioner's older brother and co-defendant in his state criminal case, for first-degree murder, attempted first-degree murder, aggravated assault, and possession of a deadly weapon with intent to employ it in the commission of or escape from an offense. (Doc. No. 28-1 at 5–10.) On July 20, 2007, a superseding indictment charged Petitioner and Elvin[1] for the same first-degree

---

[1] "In order to avoid confusion, and because they share a last name," the Tennessee Court of Criminal Appeals referred to Elvin Pearson and Petitioner Marcus Pearson as "Elvin" and "Marcus" on direct appeal. State v. Pearson, No. M2007-02826-CCA-R3-CD, 2009 WL 1616678, at *1 n.1 (Tenn. Crim. App. June 10, 2009). For this same reason, the Court may refer to Elvin Pearson as "Elvin," but will continue to refer to Marcus Pearson as Petitioner.

murder, attempted first-degree murder, and possession of a deadly weapon, and added two felony-murder charges and another charge for attempted first-degree murder. (Id. at 32–39.)

On August 31, 2007, the jury found Petitioner guilty on all counts, except that the state abandoned prosecution of the deadly-weapon charge. (Doc. No. 28-1 at 100–01.) The court merged the first-degree murder conviction with the two felony-murder convictions, and sentenced Petitioner to life imprisonment on those three counts. (Id. at 131–33.) The court also sentenced Petitioner to concurrent 20-year sentences for the two counts of attempted first-degree murder, to be served consecutively to his life sentence. (Id. at 134–35, 153.) The Tennessee Court of Criminal Appeals ("TCCA") affirmed Petitioner's convictions,[2] and the Tennessee Supreme Court denied Petitioner's application for permission to appeal on October 19, 2009. State v. Pearson, No. M2007-02826-CCA-R3-CD, 2009 WL 1616678, at *1, 14 (Tenn. Crim. App. June 10, 2009), perm. app. denied Oct. 19, 2009.

In June 2011, Petitioner submitted a *pro se* petition for post-conviction relief. (Doc. No. 28-19 at 21–32.) The court appointed counsel (id. at 33–34, 44–45), and appointed counsel eventually[3] filed an amended petition[4] (id. at 53–59). Petitioner then retained counsel to represent him (id. at 60–61), and retained counsel filed another amended petition (id. at 62–75). The court held an evidentiary hearing on April 8, 2015. (Id. at 76; Doc. No. 28-2.)

---

[2] The TCCA, however, remanded for resentencing because the court did not make findings necessary to run Petitioner's 20-year sentence consecutive to his life sentence. State v. Pearson, 2009 WL 1616678, at *1, 13. The court did not enter an amended judgment in accordance with these instructions until August 2013. (Doc. No. 28-19 at 46–50.)

[3] Nearly three years passed between the court appointing counsel and that counsel filing an amended petition. During that time, the court denied the petition as untimely (Doc. No. 28-19 at 37), Petitioner appealed, and the TCCA reversed and remanded for the trial court to conduct an evidentiary hearing on the timeliness of the petition. (Doc. No. 28-18); Pearson v. State, No. M2012-01529-CCA-R3-PC, 2013 WL 1912586 (Tenn. Crim. App. May 8, 2013). On remand, it appears the state did not contest the timeliness of the petition. (Doc. No. 28-19 at 51–52.)

[4] This petition is labeled "Second Amended Petition for Post-Conviction Relief" (Doc. No. 28-19 at 53), but the technical record does not contain a *first* amended petition filed by appointed counsel.

On May 28, 2015, the trial court dismissed Petitioner's post-conviction petition. (Doc. No. 28-19 at 77–81.) Petitioner appealed, first arguing the merits of various claims, and second contending that the court's dismissal order set forth insufficient findings of fact and conclusions of law. (Doc. No. 28-23 at 12–19.) The TCCA agreed with Petitioner's second contention, and remanded the case for the trial court to enter an amended order including findings of fact and conclusions of law addressing the claims raised in retained counsel's amended petition. (Doc. No. 28-20 at 2.) In April 2016, the trial court entered an amended order denying relief. (Doc. No. 28-20 at 4–9.) The TCCA affirmed, and the Tennessee Supreme Court denied discretionary review on October 19, 2016. (Doc. No. 28-25); Pearson v. State, No. M2015-01159-CCA-R3-PC, 2016 WL 2779229 (Tenn. Crim. App. May 13, 2016), perm. app. denied Oct. 19, 2016.

On November 22, 2016, this Court received Petitioner's *pro se* habeas corpus Petition under 28 U.S.C. § 2254. (Doc. No. 1.) Respondent acknowledges the Petition is timely. (Doc. No. 29 at 2.) In the Petition, Petitioner asserts that trial counsel was ineffective in four ways: (1) abandoning Petitioner's alibi defense at trial, leaving Petitioner without any defense; (2) failing to inform him of a pre-trial plea discussion involving a 25 year sentence; (3) failing to respond to the superseding indictment by requesting discovery, obtaining a continuance, or filing a motion for a bill of particulars; and (4) failing to request a jury charge regarding the "natural and probable consequences rule." (Doc. No. 2 at 9–12; Doc. No. 11 at 4–9.)

## II.    Summary of the Evidence

On direct appeal, the Tennessee Court of Criminal Appeals provided a comprehensive summary of the evidence at trial. To recap, there were three victims in this case—Kenneth Scott, Frank Newsome, and Lamarco Comer. State v. Pearson, 2009 WL 1616678, at *1–2. The superseding indictment charged Petitioner and his brother with the first-degree premeditated

murder of Scott, the felony murder of Scott while attempting the first-degree murder of Newsome, the felony murder of Scott while attempting the first-degree murder of Comer, the attempted first-degree premeditated murder of Newsome, and the attempted first-degree premeditated murder of Comer. (Doc. No. 28-1 at 32–38.)

On the afternoon of April 15, 2006, Newsome drove Scott and Comer to the Knoll Crest Apartments, where Andrew Shute was located. State v. Pearson, 2009 WL 1616678, at *1. Earlier that day, Shute told Newsome he agreed to sell "$600 to $700 of marijuana" to Petitioner, and he planned to take the money from Petitioner and leave without giving him the marijuana. Id. at *2. Scott and Comer were not aware of Shute's plan. Id. When Newsome arrived at Knoll Crest, Shute got in his car. Id. Shute called Petitioner and instructed him to park at a particular place at Knoll Crest for their meeting, and Newsome drove Shute to that same place. Id. Petitioner was parked at the designated meeting spot, with his younger brother, Ronald Ettienne, in the passenger seat. Id. Shute got out of Newsome's car and into the back seat of Petitioner's car. Id. Newsome drove away. Id. Shute told Petitioner he had marijuana in a nearby breezeway and requested the money before retrieving it. Id. Petitioner gave Shute the money. Id. Shute walked into the breezeway out of Petitioner's sight, ran to a friend's waiting car, and left. Id.

Newsome, Scott, and Comer returned to Knoll Crest within an hour and parked in front Newsome's sister's building. Id. As they exited the car, Petitioner and his older brother, Elvin Pearson, arrived in separate cars and pulled to the right of Newsome's vehicle. Id. The TCCA summarized the ensuing events as follows:

> Newsom[e], Scott, and Comer now faced the parking lot, with their backs to the entrance of a two-sided breezeway running away from them and through building F. Comer stood between Newsom[e] and Scott; Scott stood on Comer's left and Newsom[e] stood on Comer's right. Elvin and Marcus walked toward them. Elvin stood in front of Newsom[e], and Marcus stood in front of Scott. Elvin asked Newsom[e], "where your boy at?" Newsom[e], assuming he was referring to Shute,

responded that he did not know. Elvin and Marcus each pulled out a gun; Marcus' gun was black and Elvin's gun was silver and black. Elvin pointed his gun at Newsom[e]'s face and chest. He then grabbed Newsom[e] by the shirt and demanded Marcus' money. Newsom[e] responded that he could call Shute and produced Scott's cell phone, which he had been holding. Newsom[e] dialed Shute's number and handed the phone to Elvin.

Elvin put the phone to his ear for a few moments and then angrily hung up. It is not clear whether he spoke to anyone or heard a voicemail message. After hanging up, he grabbed Newsom[e] again. At that moment, a car drove by through the parking lot and a woman yelled, "Hey, there's Booty Man" from inside. "Booty Man" is Newsom[e]'s nickname. Hearing this, Elvin and Marcus turned toward the parking lot. Seeing an opportunity for escape, Newsom[e] pulled away from Elvin, turned around, and ran through the left side of the breezeway. Newsom[e] heard shots after he had taken about two steps and saw Comer running through the right side of the breezeway. As Newsom[e] rounded the corner at the end of the breezeway he saw Elvin shooting at him. He then continued to run into the grass field behind building F. Newsom[e] was not hit and did not see any bullets hit Comer or Scott.

As Comer began running through the breezeway, he saw Scott try to run around the building. Comer also saw Elvin shooting at him. A bullet hit Comer in the leg; as he tried to get up Elvin shot him two more times in the same leg. At about the time Elvin fired the third shot into Comer's leg, Comer saw Marcus shoot Scott in the back. Comer heard about fifteen total shots. Police later found eight .40 caliber cartridge casings, five of which were clustered at the right entrance to the breezeway near where Marcus had been. The other three fell near the left entrance. Police also found five 9mm cartridge casings at the left entrance, near where Elvin had been. Comer was shot with 9mm bullets, and Scott with .40 caliber bullets.

Newsom[e] turned around when the shots stopped and saw Comer crawling out of the breezeway. He also saw Scott running through the field holding his stomach. Scott then fell down. He then saw a policeman run onto the field and check both Comer and Scott before going to the front of the building. Newsom[e] then ran over to Comer, who was still talking. He told Comer to hold on. He then ran over to Scott, who was lying face down in the grass. Newsom[e] intended to roll Scott over, but he was told not to by a member of the crowd that had gathered. Newsom[e] stayed in the field with Scott and Comer until paramedics arrived.

Karen Carney, another Knoll Crest resident, lived in building G, the building immediately next to building F. Just before the shooting, she went out onto her back porch with her son. She saw a neighbor named Carlos with whom she had experienced problems in the past. As a result, she went back inside. She then heard shots coming from outside. After putting her son under the kitchen table, she looked out her front window and saw three black males, each carrying a gun, get into separate cars and drive away. Two wore baseball caps and all three had braided hair. She looked out her back window and saw Comer and Scott lying in the field.

Officer Edward Draves of the Metro Nashville Police Department responded first to the incident. . . . Later testimony established that the shooting occurred at about 4:50 p.m. As he reached the field behind building F, Officer Draves saw two black males, later identified as Comer and Scott. Comer was running toward Officer Draves, while Scott ran away from him. Officer Draves drew his weapon on Comer and told him to lay on the ground. Comer told Officer Draves that he had been shot. After patting down Comer and calling for backup, Officer Draves ran over to Scott, who had fallen down. Officer Draves ordered Scott to put his hands out, but he received no response. Officer Draves saw a bullet entry wound underneath Scott's left shoulder. After confirming that Scott had no weapons, Officer Draves rolled him over and observed a bullet exit wound above Scott's heart.

Id. at *2–3.

Paramedics soon arrived and transported Scott and Comer to different hospitals. Id. at *4. Scott did not regain consciousness and died that day. Id. Newsome's stepfather gave Scott's father a note that read "The Shooter" and listed Petitioner's phone number, and Scott's father gave this note to a police detective. Id. Newsome communicated Petitioner's "potential involvement in the shooting" to the detective, and then Newsome's mother "insisted that he stop talking to the police." Id.

Comer, "drugged with pain medication" in the hospital, spoke to detectives the next day. Id. At trial, Comer testified that he did not recall this visit. Id. A detective used Newsome's information to compile and present an array of six photographs to Comer, including one of Petitioner. Id. Upon reaching Petitioner's photo, Comer nodded and said, "I think that's him." Id. Seeing Petitioner's photo for a second time, Comer said, "that's the one with the black gun." Id. Comer also described the shooting and stated the second shooter was Petitioner's brother or cousin. Id. Four days later, the detective presented another array of six photographs to Comer, including a photo of Elvin. Id. Upon reaching Elvin's photo, Comer said, "That might be him but his hair is different." Id. Seeing Elvin's photo for a second time, Comer "reiterated his non-positive identification, saying that the person depicted could have been the second shooter but that his hair

was too different in the picture to say for sure; the shooter had braids, whereas the pictures showed men with short hair." Id. At trial, Comer identified Petitioner and Elvin as the shooters, and testified that he had not met them before the shooting. Id.

Karen Carney, the Knoll Crest resident, talked to a detective and could not make a positive identification of Petitioner or Elvin using the photo arrays shown to Comer. Id. at *5. After speaking to Newsome and Comer, the detective disregarded Carney's claim that a third man was involved in the shooting. Id. Carney testified at trial that "she recognized Elvin as one of the men she saw running from the crime scene." Id.

Eleven days after the shooting, after consulting with an attorney, Newsome gave his account of the shooting to the police. Id. Having not spoken to Comer, Newsome positively identified Petitioner and Elvin using the photo arrays shown to Comer. Id. Newsome also identified Petitioner and Elvin as the shooters at trial. Id. He testified that he worked with Petitioner prior to the shooting for a short time, but had not previously met Elvin. Id.

At trial, the state introduced phone records from the day of the shooting establishing that "Marcus' cell called Shute's cell a number of times between 2:43 p.m. and 4:44 p.m." Id. Elvin did not have a cell phone, but there were calls from "Elvin's land line to Marcus' cell at 4:23 and 4:24 p.m," a call from "Elvin's land line to another number at 5:34 p.m," and a call from Elvin's land line to "Marcus' cell again at 8:07 p.m." Id.

Scott's autopsy reflected that he had been shot twice. Id. The gunshot wounds caused his death and were not "survivable," but they were "not necessarily immediately disabling." Id. The police did not recover any gun connected to the shooting, and the state did not present any physical evidence at trial directly linking Petitioner or Elvin to the shooting. Id.

Petitioner and Elvin both put on evidence. Elvin first called as a witness an employee who received and processed car payments for B & R Auto Sales, and then he testified himself. The employee testified that Elvin came to B & R to make a car payment on the day of the shooting around 5:00 p.m. Id. On cross-examination, he agreed that, "at a previous hearing, he had testified that Elvin came in 'after 5:00' and before 6:00 p.m." Id. He "was not one hundred percent sure Elvin was the one who made the payment, but he believed it was him." Id. Then, Elvin testified as follows:

He woke up around 10:00 a.m. and did some household chores. He took a nap from 1:00 to 4:20 p.m. He then called Marcus, who said the family was planning to attend a church play that evening. Elvin could hear in Marcus' voice that something was wrong; Marcus then told Elvin he had given money to someone for marijuana and that he thought the person had stolen the money. Marcus had been waiting for an hour for the person to come back. Elvin told Marcus he was stupid and that he should leave.

After hanging up, Elvin told his girlfriend, Dianne Reid, to dress their baby and get ready to leave for B & R which Elvin wanted to reach before its closing time at 5:00 p.m. Elvin, Reid, and their child left the house before 5:00 p.m.; Elvin believed they reached B & R about that time. Elvin and Reid next planned to stop at the beauty supply store. On their way there, Elvin stopped at a gas station to get gas and cigarettes; when there, he realized he did not have his driver's license. Reid also told Elvin she needed a refill for their child's bottle.

They therefore returned to their residence. Elvin went to the bathroom, made a call to a friend, and retrieved his driver's license and a bottle refill. He and Reid then drove to the beauty supply store, where they remained for forty-five to sixty minutes while Reid tried on wigs. They left the store at about 6:41 p.m.; Elvin could say so with specificity because they had been given a receipt that said 5:41 p.m., and Reid had commented that the time was an hour early. Elvin had lost the receipt, however, and therefore could not introduce it. Elvin and Reid next went to Wal-Mart for about forty-five minutes. They then got cigarettes and gas and returned home. They arrived "after 8:00." Elvin then called Marcus and asked him about the church play.

Elvin heard two days later that Marcus had a warrant out for his arrest. Elvin realized it was a murder warrant when he saw the story on the news. He was shocked. Elvin was arrested on April 28, 2006. He had never met Scott, Comer, or Newsom[e], and had nothing to do with the shooting.

Id. at *6.

Petitioner did not testify, but called two witnesses: a police detective and his and Elvin's mother, Cornelia Logan. The detective "testified that he helped investigate the shooting," and that Comer's mother gave "him the name of Carlos Hart as her son's possible assailant[—]the same Carlos with whom Carney had experienced problems in the past and who [another detective] chose not to pursue as a suspect." Id. Next, Logan testified regarding the day of the shooting as follows:

> Marcus had been at home when she woke up. She went to church at about 10:00 a.m. with her youngest son, Ronald Ettienne, and her eight-year-old daughter, Leah. She returned at about 1:30 p.m. to find Marcus still in the house. Because she planned to attend a church play later that evening, she took a nap from 3:00 to 5:00 p.m. When she woke up, she yelled for everyone to get ready for the play but received no response. Marcus' cell record reflected that he called Logan's cell at 5:15 p.m.; he told Logan that he and Ettienne had gone outside. They then walked into the house through the front door.

Id.

## III. Standard of Review

Federal courts have the statutory authority to grant habeas corpus relief to state prisoners under 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Harrington v. Richter, 562 U.S. 86, 97 (2011). "Congress enacted AEDPA to 'reduce delays in the execution of state and federal criminal sentences, particularly in capital cases,' and 'to further the principles of comity, finality, and federalism.'" Hill v. Curtin, 792 F.3d 670, 675 (6th Cir. 2015) (en banc) (quoting Woodford v. Garceau, 538 U.S. 202, 206 (2003)). As the United States Supreme Court explained, AEDPA reflects "the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." Harrington, 562 U.S. at 102–03 (quoting Jackson v. Virginia, 443 U.S. 307, 332 n.5 (1979)).

Habeas relief is available "only on the ground that [a petitioner] is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). But "[n]ot all constitutional errors that are brought to light on habeas review require reversal." Hendrix v. Palmer, 893 F.3d 906, 919 (6th Cir. 2018) (citing Jensen v. Romanowski, 590 F.3d 373, 379 (6th Cir. 2009)). "Habeas petitioners" are generally only "entitled to relief based on a constitutional error at trial" if "the error had substantial and injurious effect or influence in determining the jury's verdict." Gover v. Perry, 698 F.3d 295, 299 (6th Cir. 2012) (internal quotation marks omitted) (quoting Brecht v. Abrahamson, 507 U.S. 619, 637 (1993)).

Where a state court rejected a claim on the merits, a federal court may not grant habeas relief unless the state's decision was: (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States"; or (2) "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)–(2). Thus, "[t]he question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold." Schriro v. Landrigan, 550 U.S. 465, 473 (2007) (citing Williams v. Taylor, 529 U.S. 362, 410 (2000)). "The petitioner carries the burden of proof." Cullen v. Pinholster, 563 U.S. 170, 181 (2011) (citing Woodford, 537 U.S. at 25).

Under Section 2254(d)(1), a state court's decision is "contrary to" clearly established federal law "'if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases' or 'if the state court confronts a set of facts that are materially indistinguishable from a decision [of the Supreme Court] and nevertheless arrives at a [different result].'" Hill, 792 F.3d at 676 (quoting Lockyer v. Andrade, 538 U.S. 63, 73 (2003)). "Under the

'unreasonable application' clause of [Section] 2254(d)(1), habeas relief is available if 'the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case.'" Id. (quoting Harris v. Haeberlin, 526 F.3d 903, 909 (6th Cir. 2008)). A state court application is not unreasonable under this standard simply because a federal court finds it "incorrect or erroneous"—"rather," the federal court must find the state court's application was "objectively unreasonable." Id. (quoting Wiggins v. Smith, 539 U.S. 510, 520–21 (2003)).

Similarly, under Section 2254(d)(2), the federal court "may not grant habeas relief . . . simply because the court disagrees with a state trial court's factual determination." Young v. Hofbauer, 52 F. App'x 234, 236 (6th Cir. 2002). Instead, the federal court must find that "the state court's factual determination was 'objectively unreasonable' in light of the evidence presented in the state court proceedings." Id. A state court makes such an "unreasonable determination" only if "the state court's presumptively correct factual findings are rebutted by 'clear and convincing evidence' and do not have support in the record." Matthews v. Ishee, 486 F.3d 883, 889 (6th Cir. 2007) (quoting 28 U.S.C. §§ 2254(d)(2), (e)(1)); but see McMullan v. Booker, 761 F.3d 662, 670 and n.3 (6th Cir. 2014) (observing that the Supreme Court "has declined to clarify the relationship between" (d)(2) and (e)(1), and declining to read Matthews as "taking a clear position" on a circuit split about whether (d)(2) requires clear and convincing rebutting evidence). Moreover, "it is not enough for the petitioner to show some unreasonable determination of fact; rather, the petitioner must show that the resulting state court decision was 'based on' that unreasonable determination." Rice v. White, 660 F.3d 242, 250 (6th Cir. 2011) (citing Byrd v. Workman, 645 F.3d 1159, 1172 (10th Cir. 2011)).

Even the demanding review of claims rejected on the merits by a state court, however, is ordinarily only available to state prisoners who exhausted all available remedies in the state court system. 28 U.S.C. § 2254(b)–(c); Harrington, 562 U.S. at 103. This exhaustion requirement "is satisfied 'when the highest court in the state in which the petitioner was convicted has been given a full and fair opportunity to rule on the petitioner's claims.'" Kelly v. Lazaroff, 846 F.3d 819, 827–28 (6th Cir. 2017) (quoting Manning v. Alexander, 912 F.2d 878, 881 (6th Cir. 1990)). Thus, "before raising [a claim] in a federal habeas petition," a petitioner must present "the same claim under the same theory . . . to the state courts." Wagner v. Smith, 581 F.3d 410, 417 (6th Cir. 2009) (citations omitted). In Tennessee, a petitioner will "be deemed to have exhausted all available state remedies for that claim" when it is presented to the Tennessee Court of Criminal Appeals. Adams v. Holland, 330 F.3d 398, 402 (6th Cir. 2003) (quoting Tenn. Sup. Ct. R. 39).

A claim may be "technically exhausted, yet procedurally defaulted," where "a petitioner fails to present a claim in state court, but that remedy is no longer available to him." Atkins v. Holloway, 792 F.3d 654, 657 (6th Cir. 2015) (citing Jones v. Bagley, 696 F.3d 475, 483–84 (6th Cir. 2012)). The procedural default doctrine "has its roots in the general principle that federal courts will not disturb state court judgments based on adequate and independent state law procedural grounds." Dretke v. Haley, 541 U.S. 386, 392 (2004) (citations omitted). To obtain review of a procedurally defaulted claim, a petitioner must "establish 'cause' and 'prejudice,' or a 'manifest miscarriage of justice.'" Middlebrooks v. Carpenter, 843 F.3d 1127, 1134 (6th Cir. 2016) (citing Sutton v. Carpenter, 745 F.3d 787, 790–91 (6th Cir. 2014)). "[P]etitioners cannot rely on conclusory assertions of cause and prejudice to overcome procedural default; they must present affirmative evidence or argument as to the precise cause and prejudice produced." Lundgren v. Mitchell, 440 F.3d 754, 764 (6th Cir. 2006) (citation omitted).

A petitioner may establish cause by "show[ing] that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." Davila v. Davis, 137 S. Ct. 2058, 2065 (2017) (quoting Murray v. Carrier, 477 U.S. 478, 488 (1986)). "Such factors may include 'interference by officials,' attorney error rising to the level of ineffective assistance of counsel, and 'a showing that the factual or legal basis for a claim was not reasonably available.'" Hargrave-Thomas v. Yukins, 374 F.3d 383, 388 (6th Cir. 2004) (quoting McCleskey v. Zant, 499 U.S. 467, 493 (1991)). To establish prejudice, "a petitioner must show not merely that the errors at his trial created a *possibility* of prejudice, but that they worked to *his actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." Garcia-Dorantes v. Warren, 801 F.3d 584, 598 (6th Cir. 2015) (internal quotation marks omitted) (quoting Hollis v. Davis, 941 F.2d 1471, 1480 (11th Cir. 1991)). "When a petitioner fails to establish cause to excuse a procedural default, a court does not need to address the issue of prejudice." Simpson v. Jones, 238 F.3d 399, 409 (6th Cir. 2000) (citing Smith v. Murray, 477 U.S. 527, 533 (1986)).

Because the "cause and prejudice standard is not a perfect safeguard against fundamental miscarriages of justice," the United States Supreme Court has recognized "a narrow exception to the cause requirement where a constitutional violation 'probably resulted' in the conviction of one who is 'actually innocent' of the substantive offense." Dretke, 541 U.S. at 392 (quoting Murray, 477 U.S. at 478, 496).

**IV.    Analysis**

Petitioner asserts that his trial counsel was ineffective in four ways: (1) abandoning Petitioner's alibi defense, leaving Petitioner without any defense to the charges; (2) failing to inform Petitioner of a pre-trial plea discussion involving a 25-year sentence; (3) failing to respond to the superseding indictment by requesting new discovery, obtaining a continuance, or filing a

motion for a bill of particulars; and (4) failing to request a jury charge regarding the "natural and probable consequences rule." (Doc. No. 2 at 9–12; Doc. No. 11 at 4–9.)

Respondent argues that Petitioner's first and fourth claims should be denied because they are procedurally defaulted, and that his second and third claims do not survive the demanding review of claims rejected on the merits in state court. (Doc. No. 29 at 19–26.) The Court agrees that Petitioner's second, third, and fourth claims are without merit on the grounds offered by Respondent. It appears, however, that Petitioner may have exhausted his first claim, and so the Court must consider whether the state court's denial of this claim was unreasonable. Nonetheless, in doing so, the Court concludes that this claim is without merit as well.

The federal law governing whether a criminal defendant received inadequate representation is defined in Strickland v. Washington, 466 U.S. 668 (1984). Premo v. Moore, 562 U.S. 115, 121 (2011). Under Strickland, a petitioner must show (1) deficient performance of counsel and (2) prejudice to the defendant. Knowles v. Mirzayance, 556 U.S. 111, 124 (2009) (citing Strickland, 466 U.S. at 687). Trial counsel's performance is deficient where it falls "below an objective standard of reasonableness." Strickland, 466 U.S. at 687–88. "[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" Id. at 689 (citing Michel v. Louisiana, 350 U.S. 91, 101 (1955)). To establish prejudice, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694. "[A] court deciding an ineffective assistance claim" need

not "address both components of the inquiry if the defendant makes an insufficient showing on one." Id. at 697.

When a petitioner raises an exhausted ineffective-assistance claim in a federal habeas petition, "[t]he pivotal question" is not "whether defense counsel's performance fell below Strickland's standard," but "whether the state court's application of the Strickland standard was unreasonable." Harrington, 562 U.S. at 101. Thus, a federal court applies a "'doubly deferential' standard of review that gives both the state court and the defense attorney the benefit of the doubt." Burt v. Titlow, 571 U.S. 12, 15 (2013) (quoting Pinholster, 563 U.S. at 190). That is because, under Section 2254(d)(1), "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." Id. (quoting Williams, 529 U.S. at 410). Accordingly, "[a] state court must be granted a deference and latitude that are not in operation when the case involves review under the Strickland standard itself." Id.

Here, in affirming the dismissal of Petitioner's post-conviction petition, the TCCA accurately identified and explained the governing standard for ineffective-assistance claims:

> The right to effective assistance of counsel is safeguarded by the Constitutions of both the United States and the State of Tennessee. U.S. Const. amend. VI; Tenn. Const. art. I, § 9. In order to receive post-conviction relief for ineffective assistance of counsel, a petitioner must prove two factors: (1) that counsel's performance was deficient; and (2) that the deficiency prejudiced the defense. Strickland v. Washington, 466 U.S. 668, 687 (1984); see State v. Taylor, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (stating that the same standard for ineffective assistance of counsel applies in both federal and Tennessee cases). Both factors must be proven in order for the court to grant post-conviction relief. Strickland, 466 U.S. at 687; Henley [v. State], 960 S.W.2d [572,] 580 [(Tenn. 1997)]; Goad v. State, 938 S.W.2d 363, 370 (Tenn. 1996). Accordingly, if we determine that either factor is not satisfied, there is no need to consider the other factor. Finch v. State, 226 S.W.3d 307, 316 (Tenn. 2007) (citing Carpenter v. State, 126 S.W.3d 879, 886 (Tenn. 2004)). Additionally, review of counsel's performance "requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 689; see also Henley, 960 S.W.2d at 579. We will not second-guess a reasonable trial strategy, and we

will not grant relief based on a sound, yet ultimately unsuccessful, tactical decision. Granderson v. State, 197 S.W.3d 782, 790 (Tenn. Crim. App. 2006).

As to the first prong of the Strickland analysis, "counsel's performance is effective if the advice given or the services rendered are within the range of competence demanded of attorneys in criminal cases." Henley, 960 S.W.2d at 579 (citing Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)); see also Goad, 938 S.W.2d at 369. In order to prove that counsel was deficient, the petitioner must demonstrate "that counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." Goad, 938 S.W.2d at 369 (citing Strickland, 466 U.S. at 688); see also Baxter, 523 S.W.2d at 936.

Even if counsel's performance is deficient, the deficiency must have resulted in prejudice to the defense. Goad, 938 S.W.2d at 370. Therefore, under the second prong of the Strickland analysis, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. (quoting Strickland, 466 U.S. at 694) (internal quotation marks omitted).

Pearson v. State, 2016 WL 2779229, at *11-12.

## A.      Claim 1—Abandonment of Alibi Defense at Trial

Petitioner's first claim is somewhat ambiguous. In the Petition, he asserts that his "right to present a complete defense to the charge[s] was violated" because his trial counsel "abandoned the alibi defense and continued the proceedings without any defense at all to the charge[s]." (Doc. No. 11 at 4–5.) In arguing that this claim is procedurally defaulted, Respondent re-states the claim as follows: "Petitioner claims his right to present a complete defense was violated and he was denied effective assistance of trial counsel when counsel abandoned the alibi defense." (Doc. No. 29 at 19.) Thus, Respondent essentially characterizes this claim as a challenge to trial counsel's failure to follow through with an alibi defense at trial. And it is true that Petitioner did not exhaust such a claim in the state courts, so it would be procedurally defaulted.

Liberally construing the memorandum supporting the Petition, however, Petitioner characterizes this claim differently. There, Petitioner clarifies that he is not challenging the isolated

act of abandoning the alibi defense at trial; rather, he is challenging trial counsel's failure to conduct an adequate pre-trial investigation. (Doc. No. 11 at 9.) According to Petitioner, trial counsel was taken surprise by an "improperly introduced" recording that made the alibi defense untenable. (Id.) Because of trial counsel's failure to conduct an adequate pre-trial investigation, Petitioner argues, trial counsel was not prepared to rebut this recording, nor was he prepared to pursue any defense other than the alibi defense. (Id.) Thus, Petitioner argues that trial counsel's failure to investigate left him "defenseless to the offenses as charged." (Id.)

This construction of the claim, unlike the construction offered by Respondent, was raised at the initial-review stage of the state post-conviction proceedings, and on post-conviction appeal. In Petitioner's post-conviction appellate brief, he argued that trial counsel failed to conduct an adequate pre-trial investigation, such that, "[w]hen the alibi defense dissolved in trial after recordings of the codefendant were introduced, allegedly showing a fabricating of the alibi defense, [Petitioner] was left with no alternative to counter the State's witnesses." (Doc. No. 28-23 at 16.) The TCCA rejected this claim on the merits:

> The Petitioner asserts that trial counsel was ineffective because "he did practically no pre-trial investigation, failed to interview any of the State's witnesses prior to trial, and did not obtain the services of an investigator to assist him." Trial counsel has a duty to "conduct appropriate investigations, both factual and legal, to determine what matters of defense can be developed." Baxter, 523 S.W.2d at 933. "[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." Strickland, 466 U.S. at 691; see also State v. Burns, 6 S.W.3d 453, 462 (Tenn. 1999). However, "when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable." Strickland, 466 U.S. at 691.

> We note that trial counsel went to the crime scene to take photos and that he examined the file created by Elvin's pretrial investigator. Moreover, trial counsel testified that the Petitioner was adamant that he was not present at the scene of the

crimes. Trial counsel interviewed the Petitioner's mother and younger brother to confirm the Petitioner's alibi. It was not until the morning of trial that trial counsel discovered that the Petitioner's alibi was fabricated. By insisting that he had an alibi, the Petitioner gave trial counsel "reason to believe that pursuing certain investigations would be fruitless or even harmful[.]" See id. Therefore, trial counsel's failure to conduct other investigations cannot now be challenged as unreasonable. The Petitioner is not entitled to relief on this allegation.

Pearson v. State, 2016 WL 2779229, at *12.

The state court's rejection of this claim was not unreasonable. As quoted above, the TCCA credited trial counsel's evidentiary hearing testimony that "Petitioner was adamant that he was not present at the scene of the crimes." Id. Indeed, trial counsel testified that Petitioner insisted from "day one[] that it wasn't them." (Doc. No. 28-21 at 38.) As the Supreme Court explained in Strickland, "[c]ounsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information." 466 U.S. at 691. In short, "Strickland permits counsel to rely on the information provided by his client." Sutton v. Bell, No. 3:07-cv-30, 2011 WL 4594801, at *36 (E.D. Tenn. Sept. 29, 2011) (citing Strickland, 466 U.S. at 691). In doing so here, counsel's pre-trial investigation included interviewing Petitioner's mother and younger brother to prepare the alibi defense.

In counsel's judgment, it would have been counterproductive to present another defense alongside the alibi defense. (Id. at 39 ("In my opinion, if you do two inconsistent defenses, the jury has no credibility in me, because I'm saying one thing out of one side of my mouth and the other thing out of the other side of my mouth, so the jury . . . doesn't believe a word I say.").) Thus, as the TCCA noted, Petitioner's representations "gave trial counsel 'reason to believe that pursuing certain investigations would be fruitless or even harmful.'" Pearson v. State, 2016 WL 2779229,

at *12 (quoting <u>Strickland</u>, 466 U.S. at 691). In these circumstances, "counsel's failure to pursue [other] investigations may not later be challenged as unreasonable." <u>Strickland</u>, 466 U.S. at 691.

"The test for deficient performance of counsel is not whether counsel could have done more; perfection is not required. Instead, the test is whether what counsel did was within the wide range of reasonable professional assistance." <u>Sutton</u>, 2011 WL 4594801, at *37 (collecting Sixth Circuit cases). The state court, "applying a heavy measure of deference to counsel's judgments," determined that counsel's decision not to conduct pre-trial investigation inconsistent with the alibi defense fell within this "wide range of professionally competent assistance." <u>Strickland</u>, 466 U.S. at 690. This determination was not unreasonable, and so Petitioner's first claim will be denied.

### B.    Claim 2—Failure to Communicate Plea Offer

Petitioner asserts that  trial counsel was ineffective for failing to inform him of a pre-trial plea discussion involving a 25-year sentence. The TCCA rejected this claim:

> The Petitioner next argues that trial counsel was ineffective for failing to convey plea offers. The <u>Strickland</u> standard also applies during plea negotiations. <u>Missouri v. Frye</u>, —— U.S. ——, 132 S. Ct. 1399, 1407–09 (2012); <u>Nesbit v. State</u>, 452 S.W.3d 779, 787 (Tenn. 2014). Accordingly, during the plea bargain process, "counsel has the responsibility to render effective assistance as required by the Sixth Amendment." <u>Nesbit</u>, 452 S.W.3d at 787 (citing <u>Frye</u>, 132 S. Ct. 1407–08). "[A]s a general rule, defense counsel has the duty to communicate formal offers from the prosecution to accept a plea on terms and conditions that may be favorable to the accused." <u>Frye</u>, 132 S. Ct. at 1408. "A fair trial will not correct trial counsel's deficient performance in failing to convey a plea offer[.]" <u>Nesbit</u>, 452 S.W.3d at 787 (citing <u>Lafler v. Cooper</u>, —— U.S. ——, 132 S. Ct. 1376, 1381 (2012)).
>
> In this case, trial counsel testified that there was never a formal plea offer to the Petitioner. Instead, any plea offer that would have been extended to the Petitioner was contingent upon Elvin's also pleading guilty. Because Elvin did not accept a plea, no separate offer was extended to the Petitioner. Further, trial counsel noted that he told the Petitioner about the package deal during one of the Petitioner's court appearances. The Petitioner claimed that trial counsel never conveyed a plea offer, but the post-conviction court specifically discredited the Petitioner's testimony. Therefore, the Petitioner has failed to show that trial counsel was deficient and is not entitled to relief on this issue.

Pearson v. State, 2016 WL 2779229, at *13–14. Respondent contends that this ruling was not contrary to, or an unreasonable application of, clearly established federal law, nor was it based on an unreasonable determination of the facts in light of the evidence before the state court. (Doc. No. 29 at 20–23.)

It was not unreasonable for the state court to determine that trial counsel did not perform deficiently during plea negotiations. The state court reasonably determined that any plea offer to Petitioner was contingent on Elvin pleading guilty, and Elvin did not agree to do so. Thus, it found that any plea discussion did not result in a "formal offer" to Petitioner, and trial counsel cannot be deficient for failing to communicate an offer that did not exist. See Ambrose v. Romanowski, 621 F. App'x 808, 817 (6th Cir. 2015) ("If [Petitioner's] attorney[ was] never presented with a valid offer, his trial attorney[] could not have failed to convey . . . a legitimate plea offer.").

Petitioner argues that, even if the plea offer was informal and contingent on Elvin pleading guilty, counsel should have conveyed the offer to him so that he could discuss it with Elvin. (Doc. No. 2 at 10.) As stated above, however, the TCCA credited trial counsel's testimony that "he told the Petitioner about the package deal during one of the Petitioner's court appearances," and "specifically discredited the Petitioner's testimony" that "trial counsel never conveyed a plea offer." Pearson v. State, 2016 WL 2779229, at *14. The TCCA's finding on this factual determination is entitled to a presumption of correctness unless it was "'objectively unreasonable' in light of the evidence presented in the state court proceedings." Young, 52 F. App'x at 236. Petitioner's only argument disputing this finding—that trial counsel's evidentiary hearing testimony on this matter was uncertain (Doc. No. 10 at 10; Doc. No. 30 at 5)—is insufficient to overcome the presumption of correctness. Accordingly, the Court concludes that the state court

did not unreasonably apply <u>Strickland</u>'s standards in determining that counsel was not deficient during plea negotiations.

### C.    Claim 3—Inadequate Response to Superseding Indictment

A superseding indictment charged Petitioner about a month before his trial commenced. Petitioner asserts that trial counsel was ineffective in his response to this superseding indictment. Specifically, Petitioner argues that trial counsel should have requested new discovery, obtained a continuance of trial, and filed a motion for a bill of particulars. Petitioner raised this claim in his post-conviction appeal, and the TCCA rejected it:

> The Petitioner argues that trial counsel should have asked for additional discovery and requested a bill of particulars after the superseding indictment was issued in order to determine what evidence the State intended to use to prove premeditation. Further, the Petitioner asserts that a bill of particulars "would have also eliminated the theory of criminal responsibility for the actions of [Elvin] as it would have been demonstrated that [Elvin] also acted without premeditation."

> "On defendant's motion, the court may direct the district attorney general to file a bill of particulars so as to adequately identify the offense charge." Tenn. R. Crim. P. 7. The purpose of a bill of particulars is threefold: (1) to provide the "defendant with information about the details of the charge against him if this is necessary to the preparation of his defense"; (2) to assure that the defendant has the opportunity to "avoid prejudicial surprises at trial"; and (3) to preserve the defendant's plea against double jeopardy. <u>State v. Sherman</u>, 266 S.W.3d 395, 408–09 (Tenn. 2008). A bill of particulars is not a discovery device. <u>Id.</u> at 409. Instead, "the purpose of a bill of particulars is to alert criminal defendants as to the how the State will proceed with the litigation. The purpose is not to lock the State into a specific theory of prosecution." <u>Id.</u>

> In this case, the post-conviction court found that trial counsel had provided discovery to the Petitioner and that there was "no additional discovery in the super[s]eding indictment." Further, the post-conviction court held that the Petitioner had failed to prove that "had trial counsel received a more particular description it would have changed trial strategy or affected the outcome of the trial." At the hearing, trial counsel explained that he did not request additional discovery after the superseding indictment was filed because "it was the same discovery." Further, the Petitioner has failed to identify what new information would have been revealed had trial counsel requested additional discovery after issuance of the superseding indictment. Finally, the Petitioner has failed to show how requesting a bill of particulars would have provided information about the

> State's theory of premeditation. As noted above, a bill of particulars is not a discovery device, and the purpose of a bill of particulars is not to lock the State into a theory of prosecution. Id. Moreover, the Petitioner provided no evidence of what a bill of particulars would reveal, outside of his speculation that it would show there was no evidence of premeditation. Therefore, the Petitioner has failed to show that trial counsel was deficient in failing to request additional discovery or a bill of particulars, and he has failed to show that he was prejudiced by the alleged deficiency.

Pearson v. State, 2016 WL 2779229, at *13. Respondent contends that this ruling was not contrary to, or an unreasonable application of, clearly established federal law, nor was it based on an unreasonable determination of the facts in light of the evidence before the state court. (Doc. No. 29 at 23–25.)

The state court did not unreasonably apply Strickland in concluding that Petitioner failed to demonstrate both deficiency and prejudice on this claim. As to trial counsel's failure to request new discovery following the superseding indictment, the TCCA credited trial counsel's evidentiary hearing testimony that "he did not request additional discovery . . . because 'it was the same discovery.'" Pearson v. State, 2016 WL 2779229, at *13. As to counsel's failure to file a motion for a bill of particulars, the TCCA endorsed the post-conviction court's finding on the matter—"that the Petitioner had failed to prove that 'had trial counsel received a more particular description it would have changed trial strategy or affected the outcome of the trial.'" Id. Trial counsel testified at the evidentiary hearing that a more particular description of the charges would not have affected Petitioner's alibi defense. (Doc. No. 28-21 at 45 ("[U]nder our theory [Petitioner] wasn't there.").) And as stated in the Court's analysis of Petitioner's first claim, it was not unreasonable for counsel to prepare for trial in reliance on Petitioner's representations regarding the alibi defense. In sum, the TCCA found that trial counsel was not deficient for failing to request discovery he already had, or for failing to request information that would have been irrelevant to Petitioner's professed alibi defense. This determination was not unreasonable.

The TCCA additionally found that Petitioner failed to demonstrate that he was prejudiced by trial counsel's failure to request additional discovery or file a motion for a bill of particulars. The TCCA held that "the Petitioner provided no evidence of what a bill of particulars would reveal, outside of his speculation that it would show there was no evidence of premeditation." <u>Pearson v. State</u>, 2016 WL 2779229, at *13. Here, Petitioner similarly argues that a bill of particulars "would have supported a[] defense to the charge of premeditated murder." (Doc. No. 2 at 11.) But, as before the state courts, Petitioner has not identified what information additional discovery or a bill of particulars would have revealed that would have resulted in a different outcome at trial. In these circumstances, it was not unreasonable for the state courts to conclude that Petitioner failed to demonstrate the prejudice necessary to prevail on this claim. <u>See</u> <u>Stevenson v. Scutt</u>, 531 F. App'x 576, 581–82 (6th Cir. 2013) (finding a state court's determination that a habeas petitioner did not suffer prejudice "not unreasonable" where trial counsel failed to seek a bill of particulars and the petitioner "ha[d] not identified any specific defense theory he would have utilized" based on information therein).

### D.    Claim 4—Failure to Request Complete Jury Charge

Petitioner asserts that trial counsel was ineffective in failing to request a jury charge regarding the "natural and probable consequences rule." This claim is procedurally defaulted, as the counsel Petitioner retained to represent him at the initial-review stage of his post-conviction proceedings raised it in an amended petition (Doc. No. 28-19 at 67, 73), but did not do so on post-conviction appeal.

As cause to overcome this procedural default, Petitioner asserts that his post-conviction counsel was ineffective in failing to raise this claim on post-conviction appeal. (Doc. No. 30 at 13.) "In <u>Martinez v. Ryan</u>, 566 U.S. 1 (2012), and <u>Trevino v. Thaler</u>, 569 U.S. 413 (2013)," the

United States Supreme Court announced a narrow rule that treats "ineffective assistance by a prisoner's state postconviction counsel as cause to overcome the default of a single claim—ineffective assistance of trial counsel—in a single context—where the State effectively requires a defendant to bring that claim in state postconviction proceedings rather than on direct appeal." Davila, 137 S. Ct. at 2062–63. This rule, however, "does not extend to attorney error at post-conviction appellate proceedings because those proceedings are not the 'first occasion' at which an inmate could meaningfully raise an ineffective-assistance-of-trial-counsel claim." Atkins, 792 F.3d at 661 (citations omitted). Accordingly, Petitioner's fourth claim is defaulted without cause, and it is not subject to further review.

## V.    Conclusion

For these reasons, Petitioner's claims either fail on the merits or are procedurally defaulted. Accordingly, the Petition (Doc. Nos. 1 and 11) will be denied, the Motion for Bond (Doc. No. 34) will be denied as moot, and this action will be dismissed.

An appropriate Order is filed herewith.

_____
WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE